UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| AHMED ISMAIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00150-JAW |
| | ) | |
| PHILIP ROBINSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT NICHOLAS WRIGLEY'S MOTION FOR
SUMMARY JUDGMENT**

An arrestee brings suit against two of his arresting officers, arguing that the officers violated his constitutional rights by conducting an unlawful stop, by forcefully removing him from the stopped car, and by conducting an unlawful public strip search. Before the Court is a motion for summary judgment by one of the defendant officers. Because the Court concludes that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars the plaintiff's challenges to the stop and that dashcam footage of the arrest contradicts the plaintiff's other claims, the Court grants the defendant's motion.

## I.   BACKGROUND

On December 22, 2021, Ahmed Ismail filed a civil action in the Cumberland County Superior Court in the state of Maine against Maine Drug Enforcement Agency (MDEA) Special Agent Philip Robinson (S/A Robinson) and Westbrook, Maine Police Officer Nicholas Wrigley (Officer Wrigley). *State Ct. R.*, Attach. 1, *Attested Docket R.* (ECF No. 5). Mr. Ismail alleged the Defendants violated his constitutional rights during a May 2021 traffic stop by making the initial stop without reasonable suspicion, prolonging the stop to allow S/A Robinson to arrive on scene, forcefully

pulling him out of the stopped car, and conducting a public strip search. *Id.*, Attach. 2, *Compl.*

On May 19, 2022, Officer Wrigley removed the case to federal court based on federal question and supplemental jurisdiction. *Notice of Removal* (ECF No. 1). On May 25, 2022, Officer Wrigley answered the complaint and requested a jury trial. *Answer, Affirmative Defenses and Jury Trial Demand (Defendant Officer Wrigley)* (ECF No. 8). On May 26, 2022, S/A Robinson answered the complaint. *Answer and Affirmative Defenses of Def. Philip Robinson* (ECF No. 9). On June 6, 2022, Mr. Ismail responded to Officer Wrigley's answer. *Resp. to Answer* (ECF No. 11).

On May 27, 2022, the Magistrate Judge entered a Scheduling Order. *Scheduling Order* (ECF No. 10). On June 16, 2022, S/A Robinson objected to the Scheduling Order, explaining that criminal proceedings arising out of the traffic stop at issue in this case were underway in Maine state court and asking the Court to stay this case pending the resolution of the criminal matter. *Def. Robinson's Obj. to Scheduling Order & Mot. to Stay Case Pending Resolution of Criminal Proceeding* (ECF No. 12). On August 1, 2022, the Magistrate Judge granted S/A Robinson's motion and stayed the case until further order. *Order on Obj. to Scheduling Order and Mot. to Stay* (ECF No. 16). On December 19, 2022, Mr. Ismail filed a Status Report to inform the Court that the criminal proceedings had concluded and to request that this case be set for trial as soon as possible. *Pl.'s Status Report* (ECF No. 20). On January 9, 2023, the Magistrate Judge lifted the stay. *Order Lifting Stay and Am. Scheduling Order* (ECF No. 23).

On June 30, 2023, Officer Wrigley filed a motion for summary judgment and a statement of material facts.[1]  *Def. Officer Wrigley's Mot. for Summ. J.* (ECF No. 34) (*Def.'s Mot.*); *Def. Officer Wrigley's Statement of Material Facts in Support of Mot. for Summ. J.* (ECF No. 35).  Mr. Ismail did not respond to Officer Wrigley's motion, nor did he submit his own statement of material facts.[2]

## II.   STATEMENT OF FACTS

### A.   Overview

Before reciting the material facts in this case, the Court addresses Mr. Ismail's failure to respond to Officer Wrigley's statement of material facts and to submit his own statement of material facts.  District of Maine Local Rule 56(c) provides that a "party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts," which "shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts."  D. ME. LOC. R. 56(c).  This statement "may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation."  *Id.*  Local Rule 56(f) further provides that "[f]acts contained in a supporting or opposing statement of material facts, if

---

[1]     Also on June 30, 2023, S/A Robinson filed a separate motion for summary judgment and statement of material facts.  *Def. Robinson's Mot. for Summ. J.* (ECF No. 36); *Statement of Material Facts* (ECF No. 33).  The Court addresses S/A Robinson's motion in a separate order.

[2]     Beginning June 16, 2023, all court mail to Mr. Ismail at his listed address has been returned to the Clerk's Office as undeliverable.  *Mail* (ECF Nos. 32, 38, 39, 41).  "A party's obligation to maintain a current address with a court does not rest with the court, the opposing party, or a third party.  It rests solely with the party himself, in this case Mr. [Ismail]."  *Boulier v. Penobscot Cnty. Jail*, No. 1:21-cv-00080-JAW, 2022 U.S. Dist. LEXIS 39708, at *10 (D. Me. Mar. 7, 2022).  "A party, not the district court, bears the burden of keeping the court apprised of any changes in his mailing address."  *Carey v. King*, 856 F.2d 1439, 1441 (9th Cir. 1988).  Mr. Ismail was advised of this obligation.  *Notice to Self-Represented Litigants* (ECF No. 6).

supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. ME. LOC. R. 56(f). In other words, if a party opposing a motion for summary judgment fails to submit a statement of material facts as required by Local Rule 56(c), any material facts proffered by the party moving for summary judgment are deemed admitted, as long as they are supported by proper record citations.

Here, Officer Wrigley's motion for summary judgment was accompanied by a statement of material facts as required by District of Maine Local Rule 56(b).[3] Notwithstanding Mr. Ismail's failure to respond, to assure that Officer Wrigley's proposed facts are properly before the Court, the Court reviewed each proffered fact to determine whether it is adequately buttressed by the record. *See* D. ME. LOC. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment"). Having done so, the Court finds that each of Officer Wrigley's proposed facts was properly supported by a record citation. Therefore, having performed its due diligence review of the summary judgment record, the Court admits all material facts.

---

[3]     District of Maine Local Rule 56(b) provides:

> A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, each set forth in a separately numbered paragraph(s), as to which the moving party contends there is no genuine issue of material fact to be tried. Each fact asserted in the statement shall be simply and directly stated in narrative without footnotes or tables and shall be supported by a record citation as required by subsection (f) of this rule.

D. ME. LOC. R. 56(b).

Further, in support of his separate motion for summary judgment, S/A Robinson provided dashcam footage from Officer Wrigley's police cruiser, which depicts the events at issue in this case.[4]  *Statement of Material Facts*, Attach. 3, *Ex. A to Robinson Decl.* (ECF No. 33) (*Wrigley Cruiser Footage*).  The Court reviewed the dashcam footage and determined that the events depicted in it support Officer Wrigley's material facts.

### B.    Nicholas Wrigley's Material Facts

On May 19, 2021, Westbrook Police Officer Nicholas Wrigley was on duty in full uniform and in a fully marked police cruiser.  DSMF ¶ 1.  While parked near the intersection of Central Street and William Clarke Drive at around 11:30 p.m., Officer Wrigley observed a silver Ford Focus approach the intersection.  *Id.* ¶ 2.  As the car approached the intersection, the driver did not signal an intention to make a turn.  *Id.* ¶ 3.  At the intersection, the driver stopped the vehicle past the stop line.  *Id.* ¶ 4.  The driver also did not signal when making a turn at the intersection from Central Street onto William Clarke Drive.  *Id.* ¶ 5.

After the driver completed the turn onto William Clarke Drive, Officer Wrigley activated his emergency lights and siren and stopped the Ford Focus.  *Id.* ¶ 6.  Based on the totality of the circumstances, Officer Wrigley believed he had a reasonable articulable suspicion that the operator of the Ford Focus had violated 29-A M.R.S. §

---

[4]    Although Officer Wrigley did not cite the dashcam footage in his motion for summary judgment or statement of material facts, the Court is allowed to consider the video in resolving the motion under Federal Rule of Civil Procedure 56(c)(3).  *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record"); *FabriClear, LLC v. Harvest Direct, LLC*, No. 20-10580-TSH, 2023 U.S. Dist. LEXIS 41298, at *3 n.1 (D. Mass. Feb. 6, 2023) ("While the Court has no obligation to consider evidence that is not cited in the papers, the Court may consider admissible evidence in the record even if a party did not cite to the evidence").

2071(2)(B), which requires a motorist to signal before turning at an intersection.[5]  *Id.* ¶ 7.  Officer Wrigley approached the vehicle and obtained the driver's license, registration, and proof of insurance of the driver, Dawn Ricci.  *Id.* ¶ 8.

Shortly thereafter, Westbrook Police Officer Jason Kopp and S/A Robinson arrived at the scene.  *Id.* ¶ 9.  Officer Wrigley understood that earlier that evening S/A Robinson had been surveilling a known drug house in Westbrook where cocaine base is commonly used and sold.  *Id.* ¶ 10.  Officer Wrigley further understood that a few minutes before he stopped the Ford Focus, S/A Robinson had observed the car at the house he was surveilling and he saw two persons, a male and a female, leave the house, enter the vehicle, and drive away.  *Id.* ¶ 11.

Officer Wrigley observed Ms. Ricci speaking with S/A Robinson about an investigation he was conducting into potential criminal conduct at the house he had been surveilling.  *Id.* ¶ 12.  Based on Ms. Ricci's apparent cooperation with S/A Robinson and his investigation, Officer Wrigley decided not to issue her a summons for violating 29-A M.R.S. § 2071(2)(B).  *Id.* ¶ 13.

Ms. Ricci asked S/A Robinson to assist her in removing the male passenger in the front seat of the Ford Focus from the car.  *Id.* ¶ 14.  Based on that request, S/A Robinson ordered the male passenger to exit the car.  *Id.* ¶ 15.  S/A Robinson stated that he saw a cellophane baggy hanging out of the front of the male passenger's pants

---

[5]     DSMF ¶ 7 states: "Based on the totality of the circumstances Wrigley had witnessed that evening, Wrigley had a reasonable articulable suspicion that the operator of the Vehicle had violated 29-A M.R.S. § 2071(2)(B), which requires a motorist to signal before turning at an intersection."  As originally written, DSMF ¶ 7 contains a legal conclusion.  The Court modified the language of DSMF ¶ 7 to indicate that it reflects Officer Wrigley's belief.

as the male was exiting the vehicle.  *Id.* ¶ 16.  Based on his education, training, and experience, S/A Robinson believed the cellophane baggy was indicative of drug packaging.  *Id.* ¶ 17.  Based on Officer Wrigley's training and experience as a law enforcement officer, he believed that the type of cellophane baggy observed by S/A Robinson is commonly used in the sale of drugs.[6]  *Id.* ¶ 18.  S/A Robinson took possession of the cellophane baggy, which contained a rock-like substance.  *Id.* ¶ 19. In light of the totality of the circumstances—including the male passenger's presence at a known drug house a few minutes before the traffic stop and his possession of a cellophane baggy containing a rock-like substance that appeared to be crack cocaine—the officers believed there was reasonable suspicion that the male passenger was engaged in criminal activity.[7]  *Id.* ¶ 20.

At that point, Officers Kopp and Wrigley detained the male passenger for suspicion of unlawful possession of a controlled substance so that he could be questioned further.  *Id.* ¶ 21.  With Ms. Ricci's consent, S/A Robinson and Officer Wrigley searched the Ford Focus and found baggies used by drug dealers and a hypodermic needle cap.  *Id.* ¶ 22.

---

[6]     DSMF ¶ 18 reads: "Based on Wrigley's training and experience as a law enforcement officer, the type of cellophane baggie Robinson had observed hanging out of the front of the male passenger's pants is typically used in the sale of drugs."  The Court modified DSMF ¶ 18 to indicate that it reflects Officer Wrigley's belief.

[7]     DSMF ¶ 20 reads: "In light of the totality of the circumstances—including the male passenger's presence at a known drug house a few minutes before the traffic stop and his possession of a cellophane baggie that contained a rock-like substance that appeared to be crack cocaine—the officers had at least reasonable articulable suspicion to believe the male passenger was engaged in criminal activity." Because DSMF ¶ 20 as originally written contains a legal conclusion, the Court modified it to indicate that it reflects the officers' beliefs.

The male passenger identified himself as Ahmed Ismail, and he provided his date of birth. *Id.* ¶ 23. Mr. Ismail admitted that he was on probation, and he provided the name of his probation officer, David Redmond. *Id.* ¶ 24. Officer Wrigley spoke by telephone with Probation Officer Redmond and explained the circumstances of the traffic stop. *Id.* ¶ 25. Probation Officer Redmond stated that the conditions of Mr. Ismail's probation provided that Probation Officer Redmond could lawfully authorize a search of Mr. Ismail's person at any time. *Id.* ¶ 26. Probation Officer Redmond then authorized Officer Wrigley and the other officers present to search Mr. Ismail pursuant to the conditions of his probation. *Id.* ¶ 27.

S/A Robinson and Officer Kopp searched Mr. Ismail and found a large amount of cash in denominations from one dollar to one hundred dollars and a rock-like substance that appeared to be crack cocaine, which tested positive for cocaine. *Id.* ¶¶ 28-29. S/A Robinson suspected Mr. Ismail may have been in possession of additional drugs and wished to conduct a better search of his person. *Id.* ¶ 30. In particular, S/A Robinson wanted to ensure that Mr. Ismail's sweatpants were not equipped with inside pockets or drawstrings, which could have been used to tie off a bag of drugs. *Id.* ¶ 31.

For these reasons, S/A Robinson removed Mr. Ismail's sweatpants to search their contents more thoroughly after confirming that Mr. Ismail was wearing shorts underneath. *Id.* ¶ 32. Based on Officer Wrigley's training and experience as a law enforcement officer, it is standard procedure for officers to thoroughly search garments like pants for drugs and weapons when drug crimes are being investigated.

*Id.* ¶ 33.  Moreover, based on Officer Wrigley's training and experience as a law enforcement officer, it is common to remove such garments, particularly when a suspect is wearing multiple layers of clothing.  *Id.* ¶ 34.

At some point during the interactions between Mr. Ismail and the officers, Mr. Ismail reached down into the back of his pants, removed a bag containing a substance, and flung it behind him into the grass.  *Id.* ¶ 35.  Shortly thereafter, S/A Robinson found the bag on the ground a few feet from Mr. Ismail and discovered that the bag contained a large quantity of what appeared to be crack cocaine.  *Id.* ¶ 36.  The substance in the bag tested positive for cocaine.  *Id.* ¶ 37.

Based on the totality of the circumstances—including the substance that appeared to be crack cocaine that was found on his person, the bag found near him that contained a large quantity of what appeared to be crack cocaine, and the large quantity of cash found on his person—Officer Wrigley believed there was probable cause that Mr. Ismail had engaged in unlawful conduct, including Trafficking in Schedule W drugs, unlawful possession of Schedule W drugs, and Falsifying Physical Evidence.[8]  *Id.* ¶ 38.  Mr. Ismail was charged with Trafficking in Schedule W drugs, unlawful possession of Schedule W drugs, and Falsifying Physical Evidence based on these circumstances.  *Id.* ¶ 39.

---

[8]      DSMF ¶ 38 reads: "Based on the totality of the circumstances—including the substance that appeared to be crack cocaine that was found on his person, the bag found near him that contained a large quantity of what appeared to be crack cocaine, and the large quantity of cash found on his person—Wrigley had probable cause to believe that Ismail had engaged in unlawful conduct, including Trafficking in Schedule W drugs, unlawful possession of Schedule W drugs, and Falsifying Physical Evidence."  Because DSMF ¶ 38 as originally written contains a legal conclusion, the Court modified it to indicate that it reflects Officer Wrigley's belief.

Mr. Ismail pleaded guilty to charges arising out of the May 19, 2021 traffic stop, including unlawful possession of cocaine base and falsifying physical evidence. *Id.* ¶ 40.[9]  At no point during or after the removal of Mr. Ismail's pants was the bare skin on the lower half of Mr. Ismail's body exposed other than the portion of his legs visible between his shoes and his shorts. *Id.* ¶ 42.

## III.   NICHOLAS WRIGLEY'S ARGUMENTS FOR SUMMARY JUDGMENT

Officer Wrigley makes four arguments in support of his motion for summary judgment: 1) all claims in Mr. Ismail's complaint are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994); 2) the stop of the Ford Focus and search of Mr. Ismail's person did not violate the Fourth Amendment; 3) the officers did not use excessive force; and 4) Mr. Ismail's claims are barred by qualified immunity. *Def.'s Mot.* at 1-17.

Leading with his first argument, Officer Wrigley asserts that Mr. Ismail's claims "are barred by *Heck*'s favorable termination rule." *Id.* at 8.  Officer Wrigley observes that this is so because "the criminal charges to which [Mr. Ismail] pleaded guilty all stemmed from the traffic stop of Ricci's Vehicle and the observations made and information gathered by the officers at the scene of the traffic stop," meaning that "[f]or Ismail to succeed with his Section 1983 claims in this case, he would have to demonstrate unlawful conduct by the officers that would render his convictions invalid." *Id.*  He concludes that "[s]ince there are neither allegations nor evidence in this case that any of the convictions have been reversed on direct appeal, expunged

---

[9]       DSMF ¶ 41 reads: "At no time during Wrigley's interactions with Ismail on May 19, 2021 and May 20, 2021 did he use more force than was reasonably necessary to secure Ismail, nor did he observe any other officer use more force than was reasonably necessary to secure Ismail that evening."  The Court struck DMSF ¶ 41 because it asserts a legal conclusion.

by executive order, declared invalid by a court authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, [Mr. Ismail's] claims in this case are not cognizable as a matter of law." *Id.*

Turning to his second argument, Officer Wrigley remarks that "[e]ven if Ismail's claims against Wrigley are not barred by *Heck*, he is nonetheless entitled to summary judgment because the record does not support any constitutional violations as a matter of law." *Id.* Officer Wrigley maintains that the initiation of the traffic stop was lawful because he "had a reasonable articulable suspicion that the operator of the Vehicle had violated 29-A M.R.S. § 2071(2)(B) by failing to give a turn signal continuously—or, in fact, at all—during at least the last 100 feet traveled before turning." *Id.* at 9.

Further, although Officer Wrigley avers that Mr. Ismail "does not appear to assert any claim against Wrigley arising out of searches conducted after Wrigley stopped Ricci's Vehicle," he maintains that the searches conducted during the traffic stop did not violate the Fourth Amendment. *Id.* at 12. According to Officer Wrigley, "the search of Ricci's Vehicle was consistent with the Fourth Amendment" because "Ricci gave the officers permission to search her vehicle." *Id.* at 10. Likewise, Officer Wrigley contends that the search of Mr. Ismail's person was proper because "the officers had sufficient reasonable articulable suspicion to believe that Ismail may be engaged in criminal activity" and Probation Officer Redmond authorized the search pursuant to the terms of Mr. Ismail's probation. *Id.* at 11. In addition, Officer Wrigley declares that "every aspect of the search of Ismail's person was reasonable

11

in scope" because of "the evidence-based suspicion that Ismail may have drugs secreted in his pants and the limited intrusion incurred by Ismail in removing that garment while Ismail was wearing shorts underneath." *Id.* at 11-12. Therefore, Officer Wrigley concludes, "even if Ismail had intended to assert a claim against Wrigley based on the searches that occurred after he stopped the Vehicle, that claim would fail as a matter of law." *Id.* at 12.

Shifting to his third argument—that no excessive force was used during the traffic stop—Officer Wrigley first suggests that "[s]ince the Complaint does not allege that Wrigley used excessive force in his interactions with Ismail, it is likely unnecessary for Wrigley or the Court to address that issue." *Id.* Even so, Officer Wrigley continues, "[t]he record reflects that none of the officers interacting with Ismail on the evening of his arrest used more force than was reasonably necessary to detain him and secure his arrest." *Id.* at 14.

Finally, Officer Wrigley discusses qualified immunity, initially reiterating that "the record does not reflect that Wrigley violated Ismail's constitutional rights as a matter of law." *Id.* at 16. Regardless, Officer Wrigley argues that he is entitled to qualified immunity because he "did not violate any of Ismail's clearly established constitutional rights." *Id.*

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could

resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.     DISCUSSION

To begin, the Court briefly discusses Mr. Ismail's claims in more detail.  The allegations in Mr. Ismail's complaint do not paint a universal picture of clarity.  Three of Mr. Ismail's claims are clear.  Mr. Ismail definitively alleges that: 1) the Ford Focus was unlawfully stopped; 2) the stop was prolonged to allow S/A Robinson to arrive on scene; and 3) the officers used excessive force when removing him from the vehicle.

Mr. Ismail's allegations regarding the strip search, however, are less obvious. In his complaint, Mr. Ismail writes:

> While I was already cuffed up [and] headed to [the] police station for a more thorough search, he decided to start strip searching me in the middle of the street, forcefully taking my pants of[f] in [the] middle of the street and humiliating me unjustly.  He violated my liberty by strip searching me in public without due process of law.

*Compl.* at 1.  Because Mr. Ismail filed his complaint pro se, it is subject to "less stringent standards than formal pleadings drafted by lawyers."  *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).  Construed liberally, Mr. Ismail's complaint could contain three allegations related to the strip search: 1) the officers used excessive force while removing his pants; 2) the scope of the search was unreasonable in violation of the Fourth Amendment; and 3) the search violated his right to privacy.[10]

Ultimately, Mr. Ismail's specific allegations regarding the strip search need not occupy the Court because, as explained below, the dashcam video, which is part of the record in this case, clearly demonstrates that no strip search ever occurred,

---

[10]     While Mr. Ismail alleges a due process violation, there can be no due process violation under the facts alleged.

negating whatever claims Mr. Ismail might have attempted to bring.  To be fair to Mr. Ismail, who is pro se, the Court assumes he intended to bring all three potential challenges to the strip search.  Therefore, the Court reads Mr. Ismail's complaint as bringing six specific claims against Officer Wrigley.

### A.  *Heck v. Humphrey* Bars Mr. Ismail's Challenges to the Basis for and Duration of the Initial Traffic Stop

The Court initially addresses Officer Wrigley's first argument, that summary judgment is warranted because Mr. Ismail's claims are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994).  *Def.'s Mot.* at 6-8.

In *Heck*, the United States Supreme Court considered "whether a state prisoner may challenge the constitutionality of his conviction in a suit for damages under 42 U.S.C. § 1983." 512 U.S. at 478.  In answering this question, the *Heck* Court observed that "[w]e have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability," *id.* at 483, and the Court opined that "[w]e think the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution." *Id.* at 486.

The Court then held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make

such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87.

The *Heck* Court instructed that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. The Court also cautioned that "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* (emphasis in original). Accordingly, "to determine *Heck*'s applicability, a court must examine 'the relationship between the § 1983 claim and the conviction, including asking whether the plaintiff could prevail only by negat[ing] an element of the offense of which he [was] convicted.'" *O'Brien v. Town of Bellingham*, 943 F.3d 514, 529 (1st Cir. 2019) (alterations in original) (quoting *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006)).

Because *Heck* provides a jurisdictional bar, the Court must assess Officer Wrigley's *Heck* argument before proceeding to the merits of Mr. Ismail's claims. *See id.* ("Whether *Heck* bars § 1983 claims is a jurisdictional question that can be raised at any time during the pendency of litigation"). The Court concludes that *Heck* bars Mr. Ismail's challenges to the justification for and duration of the initial stop, but Mr. Ismail's excessive force claim and challenges to the strip search are not barred by *Heck*.

The lynchpin of the *Heck* analysis is whether success on a § 1983 claim would *necessarily* invalidate Mr. Ismail's convictions for drug possession and falsifying physical evidence. *Ballenger v. Owens*, 352 F.3d 842, 846 (4th Cir. 2003) ("The logical *necessity* that the judgment in the § 1983 case imply the invalidity of a criminal conviction is at the heart of the *Heck* requirement for dismissal of the § 1938 action" (emphasis in original)).  Were Mr. Ismail to succeed on his challenge to the initial traffic stop, his state convictions could not stand because all the evidence against him would be rendered inadmissible.  *See Seidell v. Huggins*, No. 1:22-cv-00192-NT, 2023 U.S. Dist. LEXIS 75840, at *11 (D. Me. May 2, 2023) (rejecting the plaintiff's claim "that he was subject to a search that violated the Fourth Amendment because the police had insufficient grounds to conduct the stop" as "[s]uccess on this claim would demonstrate the invalidity of his conviction because it would have made the drugs that he was charged with possessing inadmissible evidence").  The same holds true for Mr. Ismail's claim that the traffic stop was unlawfully prolonged to allow S/A Robinson to arrive on scene because no evidence of a crime was uncovered before S/A Robinson arrived.  *See United States v. Moustrouphis*, 560 F. Supp. 3d 333, 340, 343 (D. Me. 2021) (suppressing all evidence obtained after the traffic stop became prolonged).

Without any evidence, the state could not have charged or convicted Mr. Ismail of the crimes to which he pleaded guilty.[11]  Therefore, the Court concludes that *Heck*

---

[11]     It is well established that *Heck* "applies when the plaintiff has entered a guilty plea and been convicted." *Seidell*, 2023 U.S. Dist. LEXIS, at *10-11 (citing *O'Brien*, 943 F.3d at 523; *Reeves v. United States*, No. 1:16-cv-00193-NT, 2016 U.S. Dist. LEXIS 58331, at *2 (D. Me. May 3, 2016); and *Cabot v. Lewis*, 241 F. Supp. 3d 239, 250 (D. Mass. 2017)).

bars Mr. Ismail's challenges to the initial stop, and accordingly, the Court grants summary judgment to Officer Wrigley on these claims.

In contrast, success on an excessive force claim does not necessarily invalidate a prior conviction. *See Thore*, 466 F.3d at 180 ("A § 1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction . . . ."). Instead, courts evaluating whether *Heck* bars a § 1983 excessive force claim must ask whether the excessive force claim and the plaintiff's conviction are "so interrelated factually as to bar the §1983 claim." *O'Brien*, 943 F.3d at 529 (quoting *Thore*, 466 F.3d at 180).

In *Mangual v. City of Worcester*, 285 F. Supp. 3d 465 (D. Mass. 2018), the defendants moved for summary judgment on the plaintiff's § 1983 excessive force claim arising out of a strip search, arguing that the claim was barred by *Heck*. *Id.* at 468-70. The U.S. District Court for the District of Massachusetts allowed some of the plaintiff's claims to proceed, concluding that *Heck* only barred the plaintiff's allegations to the extent they challenged the officers' use of force to extract drugs from the plaintiff's rectum. *Id.* at 472-73. The court denied summary judgment for the defendants as to the plaintiff's challenges to force not directly tied to the discovery of evidence. *Id.*

Applying the logic of *Mangual* to Mr. Ismail's excessive force claim, the Court concludes that Mr. Ismail's claim is not "so interrelated factually" to his conviction that the *Heck* bar applies. During the hearing at which Mr. Ismail pleaded guilty to

18

the criminal charges stemming from the traffic stop at issue in this case, the state prosecutor listed several pieces of evidence supporting Mr. Ismail's conviction. These included: a plastic baggie protruding from Mr. Ismail's waistband, which S/A Robinson believed to be indicative of drug packaging; a small white rock suspected to be crack cocaine residue, which was found in Mr. Ismail's front left pants pocket before his sweatpants were removed; and a baggie containing several smaller bags of cocaine base, which Mr. Ismail had flung into the grass. DSMF, Attach. 1, *Rule 11 Hr'g/Sentencing Tr.* at 7:2-9:9.

The only evidence discovered while Mr. Ismail was exiting the Ford Focus was the cellophane baggy protruding from his waistband. *Wrigley Cruiser Video* at 14:55-15:58. Even assuming, for the sake of argument, that the cellophane baggy were suppressed, there would still be sufficient admissible evidence to convict Mr. Ismail. This evidence would include the cocaine residue found in Mr. Ismail's sweatpants and the large amount of crack cocaine found behind Mr. Ismail. Because suppression of the cellophane baggie would not necessarily invalidate Mr. Ismail's convictions, *Heck* does not bar Mr. Ismail's excessive force claim.

The same logic applies to Mr. Ismail's challenges to the alleged strip search. No evidence was discovered while the officers were removing and searching Mr. Ismail's sweatpants. *Wrigley Cruiser Video* at 40:15-43:49. Therefore, even if Mr. Ismail were to succeed on his challenges to the search, the state would be able to introduce its full complement of evidence. In other words, success on these challenges would not necessarily invalidate Mr. Ismail's convictions, so the *Heck* bar does not

apply.  See *Heck*, 512 U.S. at 487 ("[I]f the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit" (emphasis in original)).  The Court reviews Mr. Ismail's excessive force claims and challenges to the alleged strip search on the merits.

### B.  The Officers Did Not Use Excessive Force While Mr. Ismail Was Exiting the Ford Focus

Mr. Ismail's brings an excessive force claim challenging the force used by the officers while he was exiting the Ford Focus.[12]  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Here, that right is Mr. Ismail's Fourth Amendment right to be free from unreasonable searches and seizures.  *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard").

To prevail on an excessive force claim arising under the Fourth Amendment, "a plaintiff must show that the defendant employed force that was unreasonable

---

[12]     Officer Wrigley argues he is not implicated by this excessive force claim.  *See Def.'s Mot.* at 12 ("Since the Complaint does not allege that Wrigley used excessive force in his interactions with Ismail, it is likely unnecessary for Wrigley or the Court to address that issue").  True, Mr. Ismail alleges that only S/A Robinson "forcibly pulled [him] out of [the] car."  *Compl.* at 1.  However, Officer Wrigley's dashcam footage clearly establishes that S/A Robinson never touched Mr. Ismail and that Officers Wrigley and Kopp did.  *Wrigley Cruiser Video* at 14:55-16:20.  Because pro se complaints are held "to less stringent standards than formal pleadings drafted by lawyers," *Haines*, 404 U.S. at 520-21, and because it would be understandable for Mr. Ismail, who likely had not seen the video at the time he filed his complaint, to confuse the actions of particular officers, the Court interprets Mr. Ismail's claim as challenging the force used by both Defendants.

under all the circumstances." *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (quoting *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009)). "'Determining whether a particular use of force is reasonable requires consideration of the totality of the circumstances,' including (1) 'the severity of the crime at issue,' (2) 'whether the suspect pose[d] an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight' (the '*Graham* factors')." *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (alteration in original) (quoting *Gray*, 917 F.3d at 8).

Here, it is unnecessary to reach the *Graham* factors, because Officer Wrigley's dashcam footage plainly reveals that Mr. Ismail got out of the vehicle on his own and none of the officers used any force, much less excessive force. At 14:55, S/A Robinson approaches the driver's side of the Ford Focus and begins speaking through the open window. *Wrigley Cruiser Video* at 14:55. Roughly twenty-five seconds later, Officer Kopp opens the passenger door. *Id.* at 15:20-15:25. Mr. Ismail clearly steps out of the car under his own power. *Id.* at 15:22-15:27. Once Mr. Ismail is on his feet, Officer Kopp grabs his left arm and leads him from the street onto the curb. *Id.* at 15:27-15:36. Officer Wrigley then grabs Mr. Ismail's right arm. *Id.* at 15:36-15:39. The officers proceed to handcuff Mr. Ismail. *Id.* at 15:39-16:12. Officer Wrigley then stands back while Officer Kopp stands near Mr. Ismail. *Id.* at 16:12-16:20.

Based on Officer Wrigley's dashcam footage, the Court concludes that the officers applied no force at all during Mr. Ismail's exit from the vehicle and no more force than necessary to place Mr. Ismail in handcuffs during his detention. In

particular, the video refutes Mr. Ismail's allegation that he was "forcibly" pulled out of the car, as he can be clearly seen exiting the Ford Focus under his own power. Although the Court is required to view the record in the light most favorable to Mr. Ismail as the nonmoving party, the Court must not ignore what is clear from the dashcam footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

The Court concludes that, under the totality of the circumstances, there was no law enforcement force of any kind as Mr. Ismail exited the vehicle and any subsequent force, which was extremely mild, was reasonable to place Mr. Ismail in handcuffs. Accordingly, the Court grants summary judgment to Officer Wrigley on Mr. Ismail's claim that the officers used excessive force when he was exiting the Ford Focus.

### C.   Mr. Ismail's Challenges to the Alleged Strip Search Fail Because No Strip Search Ever Occurred

Mr. Ismail's final claim is that he was subjected to an unlawful strip search, during which S/A Robinson "forcefully [took] my pants of[f] in the middle of [the] street and humiliate[d] me unjustfully" and "violated my liberty by strip searching me in public."[13] *Compl.* at 1. Here again, Mr. Ismail's claims are at odds with Officer

---

[13]     Once again, Mr. Ismail alleges that only S/A Robinson participated in the allegedly unconstitutional acts at issue in this claim. *Compl.* at 1. Because Officer Wrigley's dashcam footage conclusively disproves Mr. Ismail's allegations, however, the Court will assume the allegation applies to both Defendants and will review the merits of Mr. Ismail's claim.

Wrigley's dashcam footage. After S/A Robinson and Officer Kopp searched Mr. Ismail and found a large amount of cash in denominations from one dollar to one hundred dollars and a rock-like substance that tested positive for cocaine, S/A Robinson suspected that Mr. Ismail may have been in possession of additional drugs and wished to conduct a better search of his person. DSMF ¶¶ 28-30. This search begins at 40:15, when S/A Robinson approaches Mr. Ismail, who is standing on the curb next to Officer Kopp. *Wrigley Cruiser Video* at 40:15.

Upon reaching Mr. Ismail, S/A Robinson speaks with him for roughly forty seconds. *Id.* at 40:15-40:55. During this time, Mr. Ismail is wearing three layers of clothing over his lower body: a pair of white sweatpants; a pair of white basketball shorts; and a pair of dark underwear. Previously, after Mr. Ismail had stepped out of the vehicle, the top of his sweatpants was near his beltline in the front, but below his rearend, showing a line of black underwear between his tee-shirt and sweatpants. *Id.* at 21:55-35:55. At 36:17, the officers began to search Mr. Ismail's sweatpants and look inside his sweatpants pockets. As they did so, the sweatpants slid down, exposing some of his black underwear[14] and his basketball shorts. *Id.* at 36:17-37:45.

At 40:58, S/A Robinson begins pulling down Mr. Ismail's sweatpants, which were already sitting slightly above his knees. *Id.* at 40:58-41:04. After S/A Robinson stops tugging on Mr. Ismail's pants, Mr. Ismail removes his right shoe. *Id.* at 41:04-

---

[14]     Mr. Ismail is some distance from the cruiser's dashcam, and the Court's view is not perfect, but it appears that he was wearing a pair of athletic underpants often worn under gym clothes. The Court does not want to leave the impression that Mr. Ismail was standing by the roadside with traditional men's underpants showing, because from a casual observer, it would appear that he was almost wearing another pair of shorts under his basketball shorts.

41:08.  S/A Robinson subsequently points to an area of the sidewalk, and Mr. Ismail moves to this area and removes his left shoe.  *Id.* at 41:08-41:17.  S/A Robinson searches Mr. Ismail's shoes.  *Id.* at 41:17-41:32.

At 41:30, Officer Wrigley approaches, at which point S/A Robinson can be heard telling Mr. Ismail that he's going to remove Mr. Ismail's sweatpants so that he doesn't trip and fall.  *Id.* at 41:30-41:43.  Mr. Ismail then asks why S/A Robinson is removing the sweatpants, and S/A Robinson reiterates that the pants are a tripping hazard.  *Id.* at 41:43-41:48.  After Mr. Ismail expresses further confusion about why S/A Robinson is removing his pants, as opposed to pulling them up, S/A Robinson states that he wants to conduct a more thorough search of the pants.  *Id.* at 41:48-41:52.

S/A Robinson then repeatedly tells Mr. Ismail to lift his leg up, and Mr. Ismail eventually complies, allowing S/A Robinson to remove the right leg of the sweatpants. *Id.* at 41:52-42:09.  Afterwards, S/A Robinson removes the left leg of Mr. Ismail's sweatpants, *id.* at 42:09-42:21, and searches Mr. Ismail's sweatpants.  *Id.* at 42:21-43:13.  Underneath Mr. Ismail's sweatpants are a pair of oversized basketball shorts. *Id.* at 42:19-42:22.  At this point, Mr. Ismail's sweatpants are completely off, his basketball shorts extend from his below his waist down to just above his ankles, exposing his black underwear from the bottom of his tee-shirt to the top of his basketball shorts.  *Id.* at 42:19-43:16.  At 43:13, S/A Robinson begins searching the pockets of Mr. Ismail's shorts without removing them.  *Id.* at 43:13-43:49.  At 43:35,

S/A Robinson pulls up Mr. Ismail's basketball shorts so that his black underwear is no longer showing.

Based on the Court's view of the dashcam video, Mr. Ismail's underpants were thus exposed for about one minute and a half. At no point were any other articles of clothing removed besides Mr. Ismail's sweatpants. Further, no skin on Mr. Ismail's lower body was ever exposed, apart from the skin visible between his shorts, which reached below his knee, and his socks.

Officer Wrigley's dashcam footage confirms unequivocally that Mr. Ismail's allegation that he was strip searched is entirely without merit. Mr. Ismail was wearing three layers of clothing over his lower body, and even after S/A Robinson removed his sweatpants, he was wearing basketball shorts and black underwear under his shorts. Once again, the Court cannot ignore what is obvious from the dashcam footage. *See Scott*, 550 U.S. at 380.

No strip searched ever occurred. *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1885 (Stuart Berg Flexner & Leonore Crary Hauck, eds., 2d. ed. 1987) (defining strip search as "to search (a suspect who has been required to remove all clothing), esp. for concealed weapons, contraband, or evidence of drug abuse"); *Morales v. Doe*, No. 17-cv-234-SM, 2021 U.S. Dist. LEXIS 167830, at *1 n.1 (D.N.H. Apr. 13, 2021) (quoting New Hampshire Department of Corrections Policy and Procedure Directive 5.77, IV(a)(3) as defining a strip search as "removing all clothing from a person and searching the clothing carefully, after which a detailed visual

inspection of the individual's naked body, including inside of the mouth, the groin area and the buttocks").

### D.     Officer Wrigley Is Entitled to Qualified Immunity

Officer Wrigley finally asserts that he is entitled to qualified immunity because he "did not violate any of Ismail's clearly established constitutional rights." *Def.'s Mot.* at 15-16.  The Court agrees with Officer Wrigley that qualified immunity poses an insurmountable hurdle for Mr. Ismail and that Mr. Ismail's claims fail for this reason as well.  However, the Court declines to engage in a qualified immunity analysis because it would only buttress a conclusion the Court already arrived at, namely that Mr. Ismail's lawsuit must fail because even viewing disputed matters in the light most favorable to Mr. Ismail, he has not stated a cognizable claim against Officer Wrigley.

## VI.   CONCLUSION

The Court GRANTS Defendant Nicholas Wrigley's Motion for Summary Judgment (ECF No. 34) and ORDERS that the Clerk enter judgment against Ahmed Ismail and in favor of Defendant Nicholas Wrigley.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of February, 2024