UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| AHMED ISMAIL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:22-cv-00150-JAW |
| | ) | |
| PHILIP ROBINSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON DEFENDANT PHILIP ROBINSON'S MOTION FOR SUMMARY
JUDGMENT**

An arrestee brings suit against two of his arresting officers, arguing that the officers violated his constitutional rights by conducting an unlawful stop, by forcefully removing him from the stopped car, and by conducting an unlawful public strip search. Before the Court is a motion for summary judgment by one of the defendant officers. Because the Court concludes that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars the plaintiff's challenges to the stop and that dashcam footage of the arrest contradicts the plaintiff's other claims, the Court grants the defendant's motion.

## I.    BACKGROUND

On December 22, 2021, Ahmed Ismail filed a civil action in the Cumberland County Superior Court in the state of Maine against Maine Drug Enforcement Agency (MDEA) Special Agent Philip[1] Robinson (S/A Robinson) and Westbrook,

---

[1]    In the Complaint, Mr. Ismail spells Phillip with two l's, *State Ct. R.*, Attach. 2, *Compl.* at 1. However, in his filings, S/A Robinson spells his first name with one l. *See Answer and Affirmative Defenses of Def. Philip Robinson* (ECF No. 9). No doubt, S/A Robinson knows how to spell his own name, and the Court accepts "Philip." Although no motion has been made, the Court sua sponte amends the caption to reflect the correct spelling of S/A Robinson's first name.

Maine Police Officer Nicholas Wrigley (Officer Wrigley).  *State Ct. R.*, Attach. 1, *Attested Docket R.* (ECF No. 5).  Mr. Ismail alleged the Defendants violated his constitutional rights during a May 2021 traffic stop by making the initial stop without reasonable suspicion, prolonging the stop to allow S/A Robinson to arrive on scene, forcefully pulling him out of the stopped car, and conducting a public strip search. *Id.*, Attach. 2, *Compl.*

On May 19, 2022, Officer Wrigley removed the case to federal court based on federal question and supplemental jurisdiction.  *Notice of Removal* (ECF No. 1).  On May 25, 2022, Officer Wrigley answered the complaint and requested a jury trial. *Answer, Affirmative Defenses and Jury Trial Demand (Def. Officer Wrigley)* (ECF No. 8).  On May 26, 2022, S/A Robinson answered the complaint.  *Answer and Affirmative Defenses of Def. Philip Robinson* (ECF No. 9).  On June 6, 2022, Mr. Ismail responded to Officer Wrigley's answer.  *Resp. to Answer* (ECF No. 11).

On May 27, 2022, the Magistrate Judge entered a Scheduling Order. *Scheduling Order* (ECF No. 10).  On June 16, 2022, S/A Robinson objected to the Scheduling Order, explaining that criminal proceedings arising out of the traffic stop at issue in this case were underway in Maine state court and asking the Court to stay this case pending the resolution of the criminal matter.  *Def. Robinson's Obj. to Scheduling Order & Mot. to Stay Case Pending Resolution of Criminal Proceeding* (ECF No. 12).  On August 1, 2022, the Magistrate Judge granted S/A Robinson's motion and stayed the case until further order.  *Order on Obj. to Scheduling Order and Mot. to Stay* (ECF No. 16).  On December 19, 2022, Mr. Ismail filed a Status

Report to inform the Court that the criminal proceedings had concluded and to request that this case be set for trial as soon as possible. *Pl.'s Status Report* (ECF No. 20). On January 9, 2023, the Magistrate Judge lifted the stay. *Order Lifting Stay and Am. Scheduling Order* (ECF No. 23).

On June 30, 2023, S/A Robinson filed a motion for summary judgment and a statement of material facts.[2] *Def. Robinson's Mot. for Summ. J.* (ECF No. 36) (*Def.'s Mot.*); *Statement of Material Facts* (ECF No. 33) (DSMF). Mr. Ismail did not respond to S/A Robinson's motion, nor did he submit his own statement of material facts.[3]

## II.   STATEMENT OF FACTS

### A.   Overview

Before reciting the material facts in this case, the Court addresses Mr. Ismail's failure to respond to S/A Robinson's statement of material facts and to submit his own statement of material facts. District of Maine Local Rule 56(c) provides that a "party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts," which "shall admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's

---

[2]      Also on June 30, 2023, Officer Wrigley filed a separate motion for summary judgment and statement of material facts. *Def. Officer Wrigley's Mot. for Summ. J.* (ECF No. 34); *Def. Officer Wrigley's Statement of Material Facts in Support of Mot. for Summ. J.* (ECF No. 35). The Court addresses Officer Wrigley's motion in a separate order.

[3]      Beginning June 16, 2023, all court mail to Mr. Ismail at his listed address has been returned to the Clerk's Office as undeliverable. *Mail* (ECF Nos. 32, 38, 39, 41). "A party's obligation to maintain a current address with a court does not rest with the court, the opposing party, or a third party. It rests solely with the party himself, in this case Mr. [Ismail]." *Boulier v. Penobscot Cnty. Jail*, No. 1:21-cv-00080-JAW, 2022 U.S. Dist. LEXIS 39708, at *10 (D. Me. Mar. 7, 2022). "A party, not the district court, bears the burden of keeping the court apprised of any changes in his mailing address." *Carey v. King*, 856 F.2d 1439, 1441 (9th Cir. 1988). Mr. Ismail was advised of this obligation. *Notice to Self-Represented Litigants* (ECF No. 6).

statement of material facts." D. Me. Loc. R. 56(c). This statement "may contain in a separately titled section additional facts, each set forth in a separately numbered paragraph and supported by a record citation." *Id.* Local Rule 56(f) further provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." D. Me. Loc. R. 56(f). In other words, if a party opposing a motion for summary judgment fails to submit a statement of material facts as required by Local Rule 56(c), any material facts proffered by the party moving for summary judgment are deemed admitted, as long as they are supported by proper record citations.

Here, S/A Robinson's motion for summary judgment was accompanied by a statement of material facts as required by District of Maine Local Rule 56(b).[4] Notwithstanding Mr. Ismail's failure to respond, to assure that S/A Robinson's proposed facts are properly before the Court, the Court reviewed each proffered fact to determine whether it is adequately buttressed by the record. *See* D. Me. Loc. R. 56(f) ("The court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment"). Having done

---

[4] District of Maine Local Rule 56(b) provides:

> A motion for summary judgment shall be supported by a separate, short, and concise statement of material facts, each set forth in a separately numbered paragraph(s), as to which the moving party contends there is no genuine issue of material fact to be tried. Each fact asserted in the statement shall be simply and directly stated in narrative without footnotes or tables and shall be supported by a record citation as required by subsection (f) of this rule.

D. Me. Loc. R. 56(b).

so, the Court finds that each of S/A Robinson's proposed facts was properly supported by a record citation. Therefore, having performed its due diligence review of the summary judgment record, the Court admits all material facts.

Further, as part of the summary judgment record, S/A Robinson provided dashcam footage from Officer Wrigley's police cruiser, which depicts the events at issue in this case. DSMF, Attach. 3, *Ex. A to Robinson Decl.* (*Wrigley Cruiser Footage*). The Court reviewed the dashcam footage and determined that the events depicted in it support S/A Robinson's material facts.

### B. Philip Robinson's Material Facts

On May 19, 2021, S/A Philip Robinson, a Special Agent with the Maine Drug Enforcement Agency, was working in plainclothes and operating an unmarked police vehicle. DSMF ¶ 1. At approximately 10:45 p.m., S/A Robinson was conducting surveillance of a residence located at 96 Central Street, Westbrook, Maine. *Id.* ¶ 2. Based on his investigations and observations, this residence was known to S/A Robinson as a drug house at which cocaine base was commonly used and from which cocaine base was commonly sold. *Id.* ¶ 3. The primary resident of the house at 96 Central Street was a known cocaine base addict and was suspected to be involved in its distribution. *Id.* ¶ 4.

At or around 10:45 p.m., a silver Ford Focus (Maine license plate 8975 XD) arrived in the area of 85 Central Street and parked.[5] *Id.* ¶ 5. Approximately four to

---

[5]     As record support for DSMF ¶ 5, S/A Robinson cites "¶¶ 45" of his declaration. Because there is no paragraph 45 of the Robinson Declaration, the Court presumes this citation was meant to refer to paragraphs four and five of the Robinson Declaration, which are supportive. *See* DSMF, Attach. 2, *Decl. of Philip Robinson* at ¶¶ 4-5 (*Robinson Decl.*). The Court admits DSMF ¶ 5.

five occupants exited the vehicle, approached the front door of the residence located at 96 Central Street, and entered the residence. *Id.* ¶ 6.

At approximately 11:30 p.m., two individuals exited the residence at 96 Central Street and returned to the parked Focus. *Id.* ¶ 7. One of the individuals was a female wearing what appeared to be a winter hat and jeans. *Id.* ¶ 8. The other was a male wearing a white shirt and white pants. *Id.* ¶ 9. The pair got into the Focus and left the area within ten minutes, driving north on Central Street. *Id.* ¶ 10.

After the Focus drove away, S/A Robinson contacted Westbrook Police Officer Nicholas Wrigley, who was patrolling in the area, about the Focus and S/A Robinson's suspicion that its occupants had just engaged in a drug transaction at the residence. *Id.* ¶ 11. Officer Wrigley was in full police uniform and was operating a marked police cruiser. *Id.* ¶ 12.

Officer Wrigley saw the Focus approach the intersection of Central Street and William Clarke Drive. *Id.* ¶ 13. The driver of the Focus did not signal a right turn before turning onto William Clarke Drive and did not stop before the stop line. *Id.* ¶ 14. Officer Wrigley activated his emergency lights and siren, and stopped the Focus on William Clarke Drive, near Spring Street. *Id.* ¶ 15. The driver of the Focus was Dawn Ricci. *Id.* ¶ 16. The passenger of the vehicle was Ahmed Ismail. *Id.* ¶ 17. Officer Wrigley advised Ms. Ricci that he had stopped her based on her failure to signal her turn onto William Clarke Drive and asked for and obtained her license, vehicle registration, and proof of insurance.[6] *Id.* ¶ 18.

---

[6]     As factual support for DSMF ¶ 18, S/A Robinson cites paragraph nine of Mr. Ismail's response to Officer Wrigley's request for admissions. Paragraph nine of Officer Wrigley's request for admissions

6

Westbrook Police Officer Jason Kopp and S/A Robinson arrived at the scene of the traffic stop after the stop occurred. *Id.* ¶ 19. Officer Wrigley's marked police cruiser was parked behind the Focus, and Officer Kopp's marked police cruiser was parked behind Officer Wrigley's cruiser. *Id.* ¶ 20. The road did not have a shoulder, so the Focus was blocking the right lane of traffic. *Id.* ¶ 21. There was grass and a sidewalk along the road where the Focus was stopped. *Id.* ¶ 22.

When S/A Robinson arrived, about three and a half minutes into the traffic stop, Officer Kopp was standing by the vehicle's passenger door, speaking to Mr. Ismail, *id.* ¶ 23, and Officer Wrigley was checking Ms. Ricci's information with dispatch. *Id.* ¶ 24. Upon his arrival, S/A Robinson saw and briefly spoke with Officer Wrigley, who was in his police cruiser. *Id.* ¶ 25. Officer Wrigley informed S/A Robinson that Mr. Ismail, the passenger of the vehicle, was refusing to identify himself. *Id.* ¶ 26.

Ms. Ricci got out of the car, and S/A Robinson spoke with her for several minutes in front of Officer Wrigley's police cruiser and away from the Ford Focus and Mr. Ismail. *Id.* ¶ 27. Because Ms. Ricci was cooperating with S/A Robinson, Officer Wrigley decided not to issue her a summons. *Id.* ¶ 28. Ms. Ricci asked S/A Robinson and the officers to remove Mr. Ismail from the Focus. *Id.* ¶ 29.

After speaking with Ms. Ricci, S/A Robinson walked back to the car and, through the open window, requested that Mr. Ismail exit the car. *Id.* ¶ 30. About

---

does not support DSMF ¶ 18. *See* DSMF, Attach. 4, *Pl.'s Resp. to Def. Officer Wrigley's Req. for Admissions Propounded Upon Pl.* at 2 (*Def. Wrigley's Req. for Admissions*). Paragraph eight of Officer Wrigley's request for admissions, however, does fully support DSMF ¶ 18. *See id.* Because Mr. Ismail admitted paragraph eight of Officer Wrigley's request for admissions, the Court admits DSMF ¶ 18.

fourteen minutes after the traffic stop was initiated, Mr. Ismail got out of the vehicle under his own power, unassisted by S/A Robinson.[7]  *Id.* ¶ 31.  S/A Robinson was standing on the driver's side of the vehicle when he asked Mr. Ismail to exit and while Mr. Ismail was exiting the car.  *Id.* ¶ 32.

As Mr. Ismail removed his seatbelt, S/A Robinson saw a cellophane baggy protruding from the waistband of Mr. Ismail's underwear.  *Id.* ¶ 33.  Because drugs are commonly packaged in identical baggies and based on his observations of Mr. Ismail leaving a known drug house, S/A Robinson requested that Officer Kopp detain Mr. Ismail pending further investigation for potential criminal activity regarding illegal drugs.  *Id.* ¶ 34.  Officer Kopp and Officer Wrigley detained Mr. Ismail on suspicion of possession of a controlled substance pending further investigation, and Officer Kopp placed Mr. Ismail in handcuffs.  *Id.* ¶ 35.

S/A Robinson returned to speak to Ms. Ricci and obtained her permission to search the vehicle.  *Id.* ¶ 36.  S/A Robinson and Officer Wrigley then searched the vehicle and found a backpack containing baggies of the type used in drug distribution and a hypodermic needle cap.  *Id.* ¶ 37.

---

[7]        In his complaint, Mr. Ismail alleges that S/A Robinson "forcibly pulled me out of [the] car while I was already steppin[g] out of the car."  *Compl.* at 1.  DSMF ¶ 31 states that Mr. Ismail "got out of the vehicle under his own power, unassisted by S/A Robinson."  DSMF ¶ 31.  This statement is supported by S/A Robinson's declaration.  *Robinson Decl.* ¶¶ 21-22.  S/A Robinson also cites the videotape from Officer Wrigley's cruiser's dashcam.  *Wrigley Cruiser Footage* at 01:23, 15:23.  The Court viewed the dashcam video, which shows Mr. Ismail's exit from the Ford Focus.  The dashcam video conclusively demonstrates that, contrary to the allegations in the complaint, law enforcement did not forcibly remove Mr. Ismail from the Ford Focus.  To the contrary, as DSMF ¶ 31 states, Mr. Ismail got out of the front passenger side of the Ford Focus under his own power unassisted by law enforcement.

Mr. Ismail told Officer Wrigley that he was on probation and provided Officer Wrigley with the name of his probation officer, David Redmond. *Id.* ¶ 38. Mr. Ismail told S/A Robinson that he had "beat" a trafficking charge and had been convicted of "possession of cocaine and pills." *Id.* ¶ 39. Officer Wrigley contacted David Redmond by telephone and explained to him the circumstances of the traffic stop and detention of Mr. Ismail. *Id.* ¶ 40. Probation Officer Redmond explained that the conditions of Mr. Ismail's probation provided that Probation Officer Redmond could lawfully authorize a search of Mr. Ismail's person at any time. *Id.* ¶ 41. Probation Officer Redmond authorized and consented to the search of Mr. Ismail, consistent with the terms of Mr. Ismail's probation. *Id.* ¶ 42.

After receiving consent to search Mr. Ismail from Probation Officer Redmond, S/A Robinson and Officer Kopp searched Mr. Ismail's person, including his front left pants pocket, where S/A Robinson found two small pebble-sized chunks of a hard, white substance. *Id.* ¶ 43. S/A Robinson conducted a chemical field test on these rocks using a cocaine swipe and received a presumptive positive result. *Id.* ¶ 44. S/A Robinson and Officer Kopp also found a large amount of cash in denominations from one dollar to one hundred dollars. *Id.* ¶ 45.

S/A Robinson suspected that Mr. Ismail may be in further possession of drugs and decided to conduct a better search of his person. *Id.* ¶ 46. It is standard procedure for officers to thoroughly search garments for drugs when drug crimes are being investigated. *Id.* ¶ 47. At this time, Mr. Ismail was wearing a pair of underwear, a pair of athletic shorts, and sweatpants; the sweatpants were falling

down and were a trip hazard.  *Id.* ¶ 48.  It is common for law enforcement officers to remove a suspect's garments to conduct a thorough search for drugs when drug crimes are being investigated and the suspect is wearing multiple layers of clothing.  *Id.* ¶ 49.

Mr. Ismail was handcuffed with his hands behind his back, standing on the sidewalk near the front passenger door of the Focus.  *Id.* ¶ 50.  S/A Robinson removed Mr. Ismail's pants to search them further.  *Id.* ¶ 51.  During and after the removal of Mr. Ismail's pants, no part of his bare skin on the lower half of his body was exposed other than the portion of his leg visible between his shoes and shorts.  *Id.* ¶¶ 52-53.

After the search was completed, Ms. Ricci was free to leave.  *Id.* ¶ 54.  S/A Robinson placed Mr. Ismail under arrest.  *Id.* ¶ 55.  At this time, Officers Kopp and Wrigley, in addition to S/A Robinson, were standing near Mr. Ismail on the sidewalk next to the Focus.  *Id.* ¶ 56.  Around this time, S/A Robinson noticed a knotted baggy, about the size of a kiwi, in the grass behind Mr. Ismail that contained a white substance.  *Id.* ¶ 57.  The bag was approximately two to three feet from where Mr. Ismail had been standing.  *Id.* ¶ 58.  Mr. Ismail had taken the bag from the back of his pants and flung it behind him into the grass a few minutes before its discovery.  *Id.* ¶ 59.

After Mr. Ismail's arrest, S/A Robinson conducted another search of his person at the Westbrook Police Department and did not locate any further evidence.  *Id.* ¶ 60.  Mr. Ismail's cash was counted and found to total $3,359.00.  *Id.* ¶ 61.  Officer Wrigley conducted a TruNarc analysis of the suspected cocaine base recovered in the

grass and the small rocks found in Mr. Ismail's pockets, which showed presumptive positive results for the presence of cocaine base. *Id.* ¶ 62.

On May 21, 2021, the day following Mr. Ismail's arrest by S/A Robinson, the state of Maine filed a four-count criminal complaint against Mr. Ismail for: Unlawful Trafficking of Scheduled Drugs in violation of 17-A M.R.S. § 1103(1-A)(A); Unlawful Possession of Scheduled Drugs in violation of 17-A M.R.S. § 1107-A(1)(B)(3); Falsifying Physical Evidence in violation of 17-A M.R.S. § 455(1)(A); and Criminal Forfeiture pursuant to 15 M.R.S. § 5826. *Id.* ¶ 63. On August 5, 2021, the state of Maine indicted Mr. Ismail on all four counts. *Id.* ¶ 64.

On December 2, 2022, Mr. Ismail pleaded guilty to two of the charges: Unlawful Possession of Cocaine Base and Falsifying Physical Evidence. *Id.* ¶ 65. That same day, Mr. Ismail admitted to the criminal forfeiture of property seized as a result of the traffic stop initiated on May 19, 2021. *Id.* ¶ 66.

At the December 2, 2022 Rule 11 plea and sentencing hearing, Mr. Ismail did not dispute or disagree with the facts recited by the prosecutor regarding the events of May 19 and 20, 2021, including that: 1) Officer Wrigley observed the driver of the Focus commit several traffic violations; 2) Ms. Ricci told S/A Robinson that she did not know Mr. Ismail or want Mr. Ismail in her car; 3) S/A Robinson observed a baggy protruding from Mr. Ismail's waistband as Mr. Ismail got out of the car, which S/A Robinson believed to be indicative of drug packaging; 4) Probation Officer Redmond, Mr. Ismail's probation officer, authorized a search of Mr. Ismail; 5) Mr. Ismail was wearing pants over his shorts when he was searched and those pants were later

11

removed; 6) during the search authorized by Probation Officer Redmond, the officers found a small white rock; and 7) the dashcam video showed Mr. Ismail reaching into his pants, removing a bag of cocaine, and flinging it into the grass behind him.  *Id.* ¶ 67.

## III.   PHILIP ROBINSON'S ARGUMENTS FOR SUMMARY JUDGMENT

S/A Robinson makes three arguments in support of summary judgment.  First, he posits that the "undisputed material facts . . . show that the stop of the vehicle was lawful; Ismail exited the vehicle voluntarily; and the search of Ismail's person was consented to by his probation officer."  *Def.'s Mot.* at 1.  Next, he contends that, even if a constitutional violation occurred, "he nevertheless would be entitled to qualified immunity because any constitutional violation was not clearly established."  *Id.* Finally, he avers that "the *Heck* doctrine bars Ismail from challenging any conduct that would necessarily invalidate the convictions resulting from the stop of the vehicle and search of his person."  *Id.* at 1-2 (citing *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994)).

Leading with his first argument—that no constitutional violations occurred during the May 19, 2021 traffic stop—S/A Robinson points out that he did not stop the Ford Focus, meaning that he "cannot be liable for any damages resulting from the stop of the vehicle because he did not engage in that conduct."  *Id.* at 6.  Quoting *García-González v. Puig-Morales*, 761 F.3d 81 (1st Cir. 2014), S/A Robinson maintains that "only those individuals who participated in the conduct that deprived the

plaintiff of his rights can be held liable" in the context of a § 1983 claim. *Id.* (quoting *García-González*, 761 F.3d at 87).

Further, S/A Robinson continues, "the stop of the Ford Focus was reasonable because Officer Wrigley observed the driver commit one or more traffic violations." *Id.* S/A Robinson points out that "the reasonableness of a traffic stop does not turn on the subjective intent of the officers involved," meaning that Officer Wrigley "had a sufficient basis to initiate the traffic stop based on the traffic violation, regardless of whether he also intended to gather evidence of other wrongdoing." *Id.* at 7.

Moving chronologically through the stop, S/A Robinson next argues that the stop was not prolonged. *Id.* at 7-8. He contends that he "arrived at the scene of the traffic stop a few minutes after Officer Wrigley pulled over Ricci and while Officer Wrigley was checking Ricci's name and information with dispatch." *Id.* at 7.

In addition, S/A Robinson avers, "[t]o the extent Ismail's complaint can be read to challenge the overall duration of the traffic stop, that claim fails." *Id.* at 8. According to S/A Robinson, Mr. Ismail was detained after exiting the Ford Focus "because the totality of the circumstances supported Robinson's reasonable suspicion to believe that Ismail was or had engaged in one or more drug crimes." *Id.* In support, S/A Robinson notes that he "saw a baggy protruding from Ismail's waistband that was similar to ones used to package drugs," that "Ismail had just been seen entering and leaving a known drug house who[se] primary resident was suspected to be engaged in cocaine base distribution," and that "after the vehicle was stopped for a traffic violation, Ismail refused to identify himself to Officer Wrigley." *Id.*

S/A Robinson then briefly discusses Mr. Ismail's claim that officers used excessive force while he was exiting the Ford Focus.  *Id.* at 9.  According to S/A Robinson, this claim "is contradicted by the undisputed facts, as captured on Officer Wrigley's police cruiser's WatchGuard recording."  *Id.*  S/A Robinson notes that when he asked Mr. Ismail to exit the Ford Focus, the two men "were on opposite sides of the car, with S/A Robinson speaking to Ismail through the open driver's side window," meaning that "it was not possible for S/A Robinson to reach Ismail."  *Id.*

Finally, S/A Robinson disputes Mr. Ismail's claim that he was strip searched. *Id.* at 9-11.  S/A Robinson avers that "[b]efore any of Ismail's garments were removed, officers established that Ismail was wearing multiple layers of clothing, i.e., a pair of underwear, a pair of athletic shorts, and sweatpants," and that "[d]uring the search, only the outermost layer of pants was removed; at no point before or after their removal was any portion of Ismail's bare skin on the lower half of his body exposed." *Id.* at 10.  Moreover, S/A Robinson maintains that "the search of Ismail's person was consented to by Ismail's probation officer," and therefore "Ismail's 'reasonable expectation of privacy arguably was sufficiently reduced, if not eliminated, so as not to offend the Fourth Amendment.'"  *Id.* at 10-11 (quoting *United States v. Coffin*, No. 1:17-cr-00025-JAW, 2017 U.S. Dist. LEXIS 193246, at *9 (D. Me. Nov. 22, 2017)).

Turning to qualified immunity, his second major argument, S/A Robinson argues that regardless of whether he "violated Ismail's constitutional rights during the events of May 19 and 20, 2021, he is entitled to qualified immunity."  *Id.* at 11. S/A Robinson contends that "[n]o reasonable officer would have understood that 1)

14

the stop of a vehicle that committed a traffic violation, 2) the request to a passenger to exit that vehicle, or 3) the search of a person with lawful consent to do so was a constitutional violation." *Id.* at 12.  In other words, he continues, "[a]lthough there was no constitutional violation experienced by Ismail in the incidents of May 20, 2021, any constitutional infirmity was not clearly established." *Id.*

Shifting to his final argument, S/A Robinson contends that "[b]ecause the stop of the Ford Focus and the subsequent search of Ismail's person produced evidence leading to the charges that Ismail pleaded guilty to, his § 1983 claim invokes the *Heck* doctrine," which "prevents litigants from using § 1983 to challenge outstanding criminal convictions." *Id.* at 12-13 (citing *Heck*, 512 U.S. at 486-87).  S/A Robinson observes that "[b]ut-for the traffic stop, Ismail would not have been searched, and the evidence eventually resulting in his criminal conviction would not have been found." *Id.* at 13.

S/A Robinson posits that this case is similar to *Ballenger v. Owens*, 352 F.3d 842 (4th Cir. 2003), in which the "Fourth Circuit held that if the plaintiff 'succeed[ed]' in demonstrating in this § 1983 case that his traffic stop was illegal, the illegality of the search would require the suppression of the evidence seized.'" *Id.* at 13 (quoting *Ballenger*, 352 F.3d at 847).  Although S/A Robinson concedes that this case differs from *Ballenger* in that "the cocaine base discovered by S/A Robinson was located on Ismail's person, and not inside the vehicle," he maintains that "if Plaintiff successfully showed that the stop of the Ford Focus was illegal, it 'would require the suppression of the evidence seized.'" *Id.* at 14 (quoting *Ballenger*, 352 F.3d at 847).

15

Therefore, S/A Robinson concludes, "Ismail's § 1983 claim should be barred under *Heck*, as Plaintiff cannot challenge the validity of the traffic stop and the evidence collected as a result of that stop, without undermining the validity of his conviction." *Id.* at 14.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex,*

*Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.   DISCUSSION

To begin, the Court briefly discusses Mr. Ismail's claims in more detail. The allegations in Mr. Ismail's complaint do not paint a universal picture of clarity. Three of Mr. Ismail's claims are clear. Mr. Ismail definitively alleges that: 1) the Ford Focus was unlawfully stopped; 2) the stop was prolonged to allow S/A Robinson to arrive on scene; and 3) the officers used excessive force when removing him from the vehicle.

Mr. Ismail's allegations regarding the strip search, however, are less obvious. In his complaint, Mr. Ismail writes:

> While I was already cuffed up [and] headed to [the] police station for a more thorough search, he decided to start strip searching me in the middle of the street, forcefully taking my pants of[f] in [the] middle of the street and humiliating me unjustly. He violated my liberty by strip searching me in public without due process of law.

*Compl.* at 1. Because Mr. Ismail filed his complaint pro se, it is subject to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam). Construed liberally, Mr. Ismail's complaint could contain three allegations related to the alleged strip search: 1) the officers used

excessive force while removing his pants; 2) the scope of the search was unreasonable in violation of the Fourth Amendment; and 3) the search violated his right to privacy.[8]

Ultimately, Mr. Ismail's specific allegations regarding the strip search need not occupy the Court because, as explained below, the dashcam video, which is part of the record in this case, clearly demonstrates that no strip search ever occurred, negating whatever claims Mr. Ismail might have attempted to bring. To be fair to Mr. Ismail, who is pro se, the Court assumes he intended to bring all three potential challenges to the strip search. Therefore, the Court reads Mr. Ismail's complaint as bringing six specific claims against Officer Wrigley.

### A. *Heck v. Humphrey* Bars Mr. Ismail's Challenges to the Basis for and Duration of the Initial Traffic Stop

The Court begins its analysis by addressing S/A Robinson's final argument, that Mr. Ismail's "§ 1983 claim should be barred under *Heck* [*v. Humphrey*, 512 U.S. 477 (1994)], as Plaintiff cannot challenge the validity of the traffic stop and the evidence collected as a result of that stop, without undermining the validity of his conviction." *Def.'s Mot.* at 14.

In *Heck*, the United States Supreme Court considered "whether a state prisoner may challenge the constitutionality of his conviction in a suit for damages under 42 U.S.C. § 1983." 512 U.S. at 478. In answering this question, the *Heck* Court observed that "[w]e have repeatedly noted that 42 U.S.C. § 1983 creates a species of tort liability," *id.* at 483, and the Court opined that "[w]e think the hoary principle

---

[8]    While Mr. Ismail alleges a due process violation, there can be no due process violation under the facts alleged.

that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution." *Id.* at 486.

The Court then held that "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 486-87.

The *Heck* Court instructed that "when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id.* at 487. The Court also cautioned that "if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit." *Id.* (emphasis in original). Accordingly, "to determine *Heck*'s applicability, a court must examine 'the relationship between the § 1983 claim and the conviction, including asking whether the plaintiff could prevail only by negat[ing] an element of the offense of which he [was] convicted.'" *O'Brien v. Town*

19

*of Bellingham*, 943 F.3d 514, 529 (1st Cir. 2019) (alterations in original) (quoting *Thore v. Howe*, 466 F.3d 173, 179 (1st Cir. 2006)).

Because *Heck* provides a jurisdictional bar, the Court must assess S/A Robinson's *Heck* argument before proceeding to the merits of Mr. Ismail's claims. *See id.* ("Whether *Heck* bars § 1983 claims is a jurisdictional question that can be raised at any time during the pendency of litigation"). The Court concludes that *Heck* bars Mr. Ismail's challenges to the justification for and duration of the initial stop, but Mr. Ismail's excessive force claim and challenges to the strip search are not barred by *Heck*.

The lynchpin of the *Heck* analysis is whether success on a § 1983 claim would *necessarily* invalidate Mr. Ismail's convictions for drug possession and falsifying physical evidence. *See Ballenger v. Owens*, 352 F.3d 842, 846 (4th Cir. 2003) ("The logical *necessity* that the judgment in the § 1983 case imply the invalidity of a criminal conviction is at the heart of the *Heck* requirement for dismissal of the § 1983 action" (emphasis in original)). Were Mr. Ismail to succeed on his challenge to the initial traffic stop, his state convictions could not stand because all the evidence against him would be rendered inadmissible. *See Seidell v. Huggins*, No. 1:22-cv-00192-NT, 2023 U.S. Dist. LEXIS 75840, at *11 (D. Me. May 2, 2023) (rejecting the plaintiff's claim "that he was subject to a search that violated the Fourth Amendment because the police had insufficient grounds to conduct the stop" as "[s]uccess on this claim would demonstrate the invalidity of his conviction because it would have made the drugs that he was charged with possessing inadmissible evidence"). The same holds true

for Mr. Ismail's claim that the traffic stop was unlawfully prolonged to allow S/A Robinson to arrive on scene because no evidence of a crime was uncovered before S/A Robinson arrived. *See United States v. Moustrouphis*, 560 F. Supp. 3d 333, 340, 343 (D. Me. 2021) (suppressing all evidence obtained after the traffic stop became prolonged).

Without any evidence, the state could not have charged or convicted Mr. Ismail of the crimes to which he pleaded guilty.[9] Therefore, the Court concludes that *Heck* bars Mr. Ismail's challenges to the initial stop, and accordingly, the Court grants summary judgment to S/A Robinson on these claims.[10]

In contrast, success on an excessive force claim does not necessarily invalidate a prior conviction. *See Thore*, 466 F.3d at 180 ("A § 1983 excessive force claim brought against a police officer that arises out of the officer's use of force during an arrest does not necessarily call into question the validity of an underlying state conviction . . ..."). Instead, courts evaluating whether *Heck* bars a § 1983 excessive force claim must ask whether the excessive force claim and the plaintiff's conviction are "so interrelated

---

[9]     It is well established that *Heck* "applies when the plaintiff has entered a guilty plea and been convicted." *Seidell*, 2023 U.S. Dist. LEXIS, at *10-11 (citing *O'Brien*, 943 F.3d at 523; *Reeves v. United States*, No. 1:16-cv-00193-NT, 2016 U.S. Dist. LEXIS 58331, at *2 (D. Me. May 3, 2016); and *Cabot v. Lewis*, 241 F. Supp. 3d 239, 250 (D. Mass. 2017)).

[10]     Even if *Heck* did not bar Mr. Ismail's challenges to the stop, these claims against S/A Robinson are not meritorious because S/A Robinson was not present for the initial stop or during the period when Mr. Ismail alleges the stop was prolonged. DSMF ¶ 19. For a plaintiff to succeed on a § 1983 claim, there "must be a causal connection between the defendant's conduct and the alleged deprivation: 'only those individuals who participated in the conduct that deprived the plaintiff of his rights can be held liable.'" *García-González v. Puig-Morales*, 761 F.3d 81, 87 (1st Cir. 2014) (quoting *Cepero-Rivera v. Fagundo*, 414 F.3d 124, 129 (1st Cir. 2005)). Because S/A Robinson did not participate in the initial stop, there is no connection between his conduct and the constitutional injuries alleged by Mr. Ismail. Therefore, S/A Robinson could not be liable for the initial stop. *See Mahmoud v. Jacques*, No. 2:14-cv-00255-JHR, 2016 U.S. Dist. LEXIS 57082, at *20-21 (D. Me. Apr. 29, 2016) (granting summary judgment on the plaintiff's false arrest claim because "there is no evidence that Provost, Johnson, or Beauparlant effectuated or participated in any way in the plaintiff's arrest").

factually as to bar the §1983 claim." *O'Brien*, 943 F.3d at 529 (quoting *Thore*, 466 F.3d at 180).

In *Mangual v. City of Worcester*, 285 F. Supp. 3d 465 (D. Mass. 2018), the defendants moved for summary judgment on the plaintiff's § 1983 excessive force claim arising out of a strip search, arguing that the claim was barred by *Heck*. *Id.* at 468-70. The U.S. District Court for the District of Massachusetts allowed some of the plaintiff's claims to proceed, concluding that *Heck* only barred the plaintiff's allegations to the extent they challenged the officers' use of force to extract drugs from the plaintiff's rectum. *Id.* at 472-73. The court denied summary judgment for the defendants as to the plaintiff's challenges to force not directly tied to the discovery of evidence. *Id.*

Applying the logic of *Mangual* to Mr. Ismail's excessive force claim, the Court concludes that Mr. Ismail's claim is not "so interrelated factually" to his conviction that the *Heck* bar applies. During the hearing at which Mr. Ismail pleaded guilty to the criminal charges stemming from the traffic stop at issue in this case, the state prosecutor listed several pieces of evidence supporting Mr. Ismail's conviction. These included: a plastic baggie protruding from Mr. Ismail's waistband, which S/A Robinson believed to be indicative of drug packaging; a small white rock suspected to be crack cocaine residue, which was found in Mr. Ismail's front left pants pocket before his sweatpants were removed; and a baggie containing several smaller bags of cocaine base, which Mr. Ismail had flung into the grass. *Def. Officer Wrigley's*

*Statement of Material Facts in Support of Mot. for Summ. J.*, Attach. 1, *Rule 11 Hr'g/Sentencing Tr.* at 7:2-9:9.

The only evidence discovered while Mr. Ismail was exiting the Ford Focus was the cellophane baggy protruding from his waistband *Wrigley Cruiser Video* at 14:55-15:58; DMSF ¶ 33.  Even assuming, for the sake of argument, that the cellophane baggy were suppressed, there would still be sufficient admissible evidence to convict Mr. Ismail.  This evidence would include the cocaine residue found in Mr. Ismail's sweatpants and the large amount of crack cocaine found behind Mr. Ismail.  Because suppression of the cellophane baggy would not necessarily invalidate Mr. Ismail's convictions, *Heck* does not bar Mr. Ismail's excessive force claim.

The same logic applies to Mr. Ismail's challenges to the alleged strip search.  No evidence was discovered while the officers were removing and searching Mr. Ismail's sweatpants.  *Wrigley Cruiser Video* at 40:15-43:49.  Therefore, even if Mr. Ismail were to succeed on his challenges to the search, the state would be able to introduce its full complement of evidence.  In other words, success on these challenges would not necessarily invalidate Mr. Ismail's convictions, so the *Heck* bar does not apply.  *See Heck*, 512 U.S. at 487 ("[I]f the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit" (emphasis in original)).  The Court reviews Mr. Ismail's excessive force claims and challenges to the alleged strip search on the merits.

**B.      S/A Robinson Did Not Use Excessive Force While Mr. Ismail Was Exiting the Ford Focus**

Mr. Ismail's brings an excessive force claim challenging the force used by the officers while he was exiting the Ford Focus.  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  Here, that right is Mr. Ismail's Fourth Amendment right to be free from unreasonable searches and seizures.  *See Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014) ("A claim that law-enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's 'reasonableness' standard").

To prevail on an excessive force claim arising under the Fourth Amendment, "a plaintiff must show that the defendant employed force that was unreasonable under all the circumstances."  *Gray v. Cummings*, 917 F.3d 1, 8 (1st Cir. 2019) (quoting *Morelli v. Webster*, 552 F.3d 12, 23 (1st Cir. 2009)).  "'Determining whether a particular use of force is reasonable requires consideration of the totality of the circumstances,' including (1) 'the severity of the crime at issue,' (2) 'whether the suspect pose[d] an immediate threat to the safety of the officers or others,' and (3) 'whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight' (the '*Graham* factors')."  *Lachance v. Town of Charlton*, 990 F.3d 14, 20 (1st Cir. 2021) (alterations in original) (quoting *Gray*, 917 F.3d at 8).

Here, it is unnecessary to reach the *Graham* factors, because Officer Wrigley's dashcam footage plainly reveals that Mr. Ismail got out of the vehicle on his own and none of the officers used any force, much less excessive force.  At 14:55, S/A Robinson

approaches the driver's side of the Ford Focus and begins speaking through the open window. *Wrigley Cruiser Video* at 14:55. Roughly twenty-five seconds later, Officer Kopp opens the passenger door. *Id.* at 15:20-15:25. Mr. Ismail clearly steps out of the car under his own power. *Id.* at 15:22-15:27. Once Mr. Ismail is on his feet, Officer Kopp grabs his left arm and leads him from the street onto the curb. *Id.* at 15:27-15:36. Officer Wrigley then grabs Mr. Ismail's right arm. *Id.* at 15:36-15:39. The officers proceed to handcuff Mr. Ismail. *Id.* at 15:39-16:12. Officer Wrigley then stands back while Officer Kopp stands near Mr. Ismail. *Id.* at 16:12-16:20.

Based on Officer Wrigley's dashcam footage, the Court concludes that the officers applied no force at all during Mr. Ismail's exit from the vehicle and no more force than necessary to place Mr. Ismail in handcuffs during his detention. In particular, the video refutes Mr. Ismail's allegation that he was "forcibly" pulled out of the car, as he can be clearly seen exiting the Ford Focus under his own power. Although the Court is required to view the record in the light most favorable to Mr. Ismail as the nonmoving party, the Court must not ignore what is clear from the dashcam footage. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment").

The Court concludes that, under the totality of the circumstances, there was no law enforcement force of any kind as Mr. Ismail exited the vehicle and any subsequent force, which was extremely mild, was reasonable to place Mr. Ismail in

handcuffs.  Accordingly, the Court grants summary judgment to S/A Robinson on Mr. Ismail's claim that the officers used excessive force when he was exiting the Ford Focus.

### C.   Mr. Ismail's Challenges to the Alleged Strip Search Fail Because No Strip Search Ever Occurred

Mr. Ismail's final claim is that he was subjected to an unlawful strip search, during which S/A Robinson "forcefully [took] my pants of[f] in the middle of [the] street and humiliate[d] me unjustfully" and "violated my liberty by strip searching me in public." *Compl.* at 1.  Here again, Mr. Ismail's claims are at odds with Officer Wrigley's dashcam footage.  After Mr. Ismail was found to be in possession of a large amount of cash and a substance that tested positive for cocaine, S/A Robinson suspected that Mr. Ismail may be in further possession of drugs and decided to conduct a better search of his person.  DSMF ¶¶ 43-46.  This search begins at 40:15, when S/A Robinson approaches Mr. Ismail, who is standing on the curb next to Officer Kopp.  *Wrigley Cruiser Video* at 40:15.

Upon reaching Mr. Ismail, S/A Robinson speaks with him for roughly forty seconds.  *Id.* at 40:15-40:55.  During this time, Mr. Ismail is wearing three layers of clothing over his lower body: a pair of white sweatpants; a pair of white basketball shorts; and a pair of dark underwear.  Previously, after Mr. Ismail had stepped out of the vehicle, the top of his sweatpants was near his beltline in the front, but below his rearend, showing a line of black underwear between his tee-shirt and sweatpants. *Id.* at 21:55-35:55.  At 36:17, the officers began to search Mr. Ismail's sweatpants and look inside his sweatpants pockets.  As they did so, the sweatpants slid down,

26

exposing his some of his black underwear[11] and his basketball shorts.  *Id.* at 36:17-37:45.

At 40:58, S/A Robinson begins pulling down Mr. Ismail's sweatpants, which were already sitting slightly above his knees.  *Id.* at 40:58-41:04.  After S/A Robinson stops tugging on Mr. Ismail's pants, Mr. Ismail removes his right shoe.  *Id.* at 41:04-41:08.  S/A Robinson subsequently points to an area of the sidewalk, and Mr. Ismail moves to this area and removes his left shoe.  *Id.* at 41:08-41:17.  S/A Robinson searches Mr. Ismail's shoes.  *Id.* at 41:17-41:32.

At 41:30, Officer Wrigley approaches, at which point S/A Robinson can be heard telling Mr. Ismail that he's going to remove Mr. Ismail's sweatpants so that he doesn't trip and fall.  *Id.* at 41:30-41:43.  Mr. Ismail then asks why S/A Robinson is removing the sweatpants, and S/A Robinson reiterates that the pants are a tripping hazard.  *Id.* at 41:43-41:48.  After Mr. Ismail expresses further confusion about why S/A Robinson is removing his pants, as opposed to pulling them up, S/A Robinson states that he wants to conduct a more thorough search of the pants.  *Id.* at 41:48-41:52.

S/A Robinson then repeatedly tells Mr. Ismail to lift his leg up, and Mr. Ismail eventually complies, allowing S/A Robinson to remove the right leg of Mr. Ismail's sweatpants.  *Id.* at 41:52-42:09.  Afterwards, S/A Robinson removes the left leg of Mr.

---

[11]      Mr. Ismail is some distance from the cruiser's dashcam, and the Court's view is not perfect, but it appears that he was wearing a pair of athletic underpants often worn under gym clothes.  The Court does not want to leave the impression that Mr. Ismail was standing by the roadside with traditional men's underpants showing, because from a casual observer, it would appear that he was almost wearing another pair of shorts under his basketball shorts.

Ismail's sweatpants, *id.* at 42:09-42:21, and searches Mr. Ismail's sweatpants. *Id.* at 42:21-43:13. Underneath Mr. Ismail's sweatpants are a pair of oversized basketball shorts. *Id.* at 42:19-42:22. At this point, Mr. Ismail's sweatpants are completely off, his basketball shorts extend from his below his waist down to just above his ankles, exposing his black underwear from the bottom of his tee-shirt to the top of his basketball shorts. *Id.* at 42:19-43:16. At 43:13, S/A Robinson begins searching the pockets of Mr. Ismail's shorts without removing them. *Id.* at 43:13-43:49. At 43:35, S/A Robinson pulls up Mr. Ismail's basketball shorts so that his black underwear is no longer showing.

Based on the Court's view of the dashcam video, Mr. Ismail's underpants were thus exposed for about one minute and a half. At no point were any other articles of clothing removed besides Mr. Ismail's sweatpants. Further, no skin on Mr. Ismail's lower body was ever exposed, apart from the skin visible between his shorts, which reached below his knee, and his socks.

Officer Wrigley's dashcam footage confirms unequivocally that Mr. Ismail's allegation that he was strip searched is entirely without merit. Mr. Ismail was wearing three layers of clothing over his lower body, and even after S/A Robinson removed his sweatpants, he was wearing basketball shorts and black underwear under his shorts. Once again, the Court cannot ignore what is obvious from the dashcam footage. *See Scott*, 550 U.S. at 380.

No strip searched ever occurred. *See* THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1885 (Stuart Berg Flexner & Leonore Crary Hauck, eds., 2d. ed.

1987) (defining strip search as "to search (a suspect who has been required to remove all clothing), esp. for concealed weapons, contraband, or evidence of drug abuse"); *Morales v. Doe*, No. 17-cv-234-SM, 2021 U.S. Dist. LEXIS 167830, at *1 n.1 (D.N.H. Apr. 13, 2021) (quoting New Hampshire Department of Corrections Policy and Procedure Directive 5.77, IV(a)(3) as defining a strip search as "removing all clothing from a person and searching the clothing carefully, after which a detailed visual inspection of the individual's naked body, including inside of the mouth, the groin area and the buttocks").

### D.   S/A Robinson Is Entitled to Qualified Immunity

S/A Robinson finally asserts that he is entitled to qualified immunity, reasoning that "[a]lthough there was no constitutional violation experienced by Ismail in the incidents of May 20, 2021, any constitutional infirmity was not clearly established." *Def.'s Mot.* at 11-12.  The Court agrees with S/A Robinson that qualified immunity poses an insurmountable hurdle for Mr. Ismail and that Mr. Ismail's claims fail for this reason as well.  However, the Court declines to engage in a qualified immunity analysis because it would only buttress a conclusion the Court already arrived at, namely that Mr. Ismail's lawsuit must fail because even viewing disputed matters in the light most favorable to Mr. Ismail, he has not stated a cognizable claim against S/A Robinson.

## VI.   CONCLUSION

The Court GRANTS Defendant Philip Robinson's Motion for Summary Judgment (ECF No. 36) and ORDERS that the Clerk enter judgment against Ahmed Ismail and in favor of Defendant Philip Robinson.

29

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of February, 2024